FILED
04/20/2022
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 10, 2021 Session

**STATE OF TENNESSEE v. MARCUS WILLINGHAM**

**Appeal from the Criminal Court of Rutherford County**
No. 78787          David M. Bragg, Judge

———————————————————

**No. M2020-01740-CCA-R3-CD**

———————————————————

A Rutherford County jury convicted the Defendant, Marcus Willingham, of ten counts of rape of a child and two counts of solicitation of sexual exploitation of a child, for which the trial court imposed an effective sentence of thirty years' incarceration.  On appeal, the Defendant contends that the trial court erred when it admitted pornographic material found on his electronic devices and that the evidence is insufficient to support his convictions.  After a thorough review of the record, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Joshua T. Crain (at trial) and Daniel W. Ames (on appeal), Murfreesboro, Tennessee, for the appellant, Marcus Willingham.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Sharon L. Reddick, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I.  Facts**

This case arises from the victim's[1] allegations that the Defendant, her biological father, showed her pornography while committing sex acts on her and forcing her to commit sex acts on him.  In January 2019, a Rutherford County Grand Jury indicted the Defendant on ten counts of rape of a child and two counts of sexual exploitation of a minor by electronic means.

---

[1] For her privacy, we will refer to the victim as "the victim."

## A. Pretrial

Pretrial, the Defendant filed a motion in *limine*, pursuant to Tennessee Rule of Evidence 404(b), to exclude any evidence that he "either viewed or possessed pornography." During her interviews, the victim described pornography the Defendant had allegedly shown her. Based on this description, law enforcement searched his devices and found pornography similar to, but not an exact match with, her description. In the Defendant's 404(b) motion, he contended that, since adult pornography found on his device did not exactly match the victim's description, such evidence was not material, and the probative value of its admission was substantially outweighed by the danger that it might unfairly prejudice the jury against him.

The State filed a response, arguing that because the use of pornography played a direct role in the charged offense of sexual exploitation of a minor, the pornographic evidence in the Defendant's possession was necessary for a purpose other than character evidence. The State contended that the evidence corroborated the victim's testimony that the Defendant had shown her pornography and was relevant to establish the Defendant had means and opportunity to engage in the sexual exploitation of a minor. The State further contended that any risk of prejudice to the Defendant created by admission of this evidence could be cured by the trial court's instructions to the jury.

At the hearing on the motion, Detective Tannas Knox testified that she was a detective in the Special Victims Unit of the Murfreesboro Police Department in November 2017, and that she responded to the Bradley Academy about the eight-year-old victim's allegation that her father had sexually abused her. Detective Knox and a Department of Children's Services ("DCS") investigator assessed the situation, collected evidence, and determined that the victim should be forensically interviewed. Detective Knox understood at the time that the Defendant had custody of the victim and that the victim resided with him, her stepmother Akeema Walker, her brother, stepbrother, and an infant stepbrother. The victim's biological mother was living in Kentucky. Detective Knox was present for a forensic interview conducted with the victim, during which the victim alleged that she had been abused. The victim said the Defendant had used his cell phone to show her pornography and then asked her to perform the same acts on him.

Detective Knox testified that, after the forensic interview, she interviewed the Defendant at the Murfreesboro Police Department. The Defendant arrived without his cell phone, explaining that, since he "didn't know what was going to happen," he left his phone with the victim's stepmother, Ms. Walker. Detective Knox obtained a cell phone from the Defendant at his home the following day. A search of the phone revealed some pornographic content, but the content found did not match the content the victim described in her forensic interview. Detective Knox believed that the Defendant was using a different

2

phone at the time of these offenses. A search warrant executed at the Defendant's residence the next month yielded two older cell phones, thumb drive storage devices, a computer hard drive, and an external drive storage device. Forensic analysis of these storage devices found approximately 400 pornographic videos, some of which substantially matched the description given by the victim, namely the description of an African-American male/female acting in a daddy/daughter scenario with the female wearing a black dress. None of the pornographic material found included a female wearing a dress with "silver sparkles." Detective Knox did not follow up and show the victim the pornography found to ascertain if it was the pornography that she had previously seen.

On cross-examination, Detective Knox reiterated that she had not interviewed the victim a second time to obtain more details about the pornography, that her search of the cell phone and other devices in the Defendant's possession was based solely on the victim's initial allegations, and that she had not attempted to contact any cell phone service provider to determine which, if any, of the three cell phones obtained from the Defendant was active at the time of the alleged offenses. Detective Knox testified that no pornography found exactly matched the victim's description of pornography. Detective Knox testified that approximately 400 pornographic videos were found on the external hard drive, four or five of which were titled daddy/daughter. In two of the daddy/daughter videos, the female was wearing black. In searching for the pornography described, Detective Knox was unsure what an eight-year-old girl would describe as "sparkly," and whether that might include dress, earrings, jewelry, or belt; therefore, Detective Knox looked for instances where the female participant was wearing black, with "sparkles anywhere in it, sparkly belt, sparkly jewelry," and found instances that would fit that description. Detective Knox testified she had not gone back to the victim to ask for more detail about what she meant by sparkles.

On re-direct examination, Detective Knox testified the victim used the term "father/daughter" instead of daddy/daughter and that some of the pornography obtained from the Defendant matched that description. Detective Knox further testified that some of the videos involved women wearing black dresses and performing the sexual acts described by the victim, but none exactly matched her description.

The trial court denied the motion in *limine*, finding that there was pornography in the Defendant's possession which was generally consistent with the pornography described by the victim during the forensic interview. The trial court noted that the pornography found did not exactly match the description given by the victim but found that fact went to the weight the jury may give the evidence and not the evidence's admissibility. The trial court found that the evidence addressed a material issue other than conduct conforming to a character trait because the Defendant's possession of pornography depicted specific sexual acts between a father and a daughter, consistent with the victim's description of the pornography shown to her, and therefore fell within the material issue exception in that it

3

showed that the Defendant had the means and opportunity to show the victim pornography. The trial court found the evidence might also show intent, as it could be inferred from the alleged victim's statement that the showing of the video was an indication of what was to take place during the abuse. For these reasons, the trial court found that the probative value of the evidence outweighed the danger of unfair prejudice and that testimony could be elicited by the State as to whether there was pornography found in the Defendant's possession generally consistent with that described by the victim.

## B. Trial

At trial, the then ten-year-old victim testified that, at the time of the abuse, she was living in Murfreesboro with the Defendant, who was her biological father, along with her older stepbrother, her brother, and an infant stepbrother. The victim testified that at the time of the abuse she was attending Bradley Academy, which was an elementary school. The victim's stepmother, Ms. Walker, worked at night, usually leaving around 9:00 PM, and the Defendant worked in the daytime, usually leaving the house in the early morning. The victim described the house in which they lived, saying it had three bedrooms, one in which the Defendant and Ms. Walker slept with their infant son, another in which her brothers slept, and one in which she slept.

The victim recalled that the Defendant had abused her and that she first attempted to tell Ms. Walker by writing her a note, which she left for her on the dining room table. When Ms. Walker did not see the note, the victim retrieved the note and put it in her backpack. It was later found and given to school administrators, who then met with her about the note. The victim identified the note, which the trial court admitted into evidence, and it read:

> Dear [Ms. Walker], this only happens when I get in trouble, like steal or I lie or get in their doorway. Daddy gets me up at night when you are at work. I have to take my pants off, and I have to put my mouth on his private parts. And he tries to put his private part in my butthole, and it hurts. And if I cry, he smacks my butt. And he makes me say things I don't want to say, like give it to me. And he licks my private parts and my butthole. I don't want – I didn't want to tell you because I thought you wouldn't believe me.

The victim said that the abuse seemed to be punishment because the Defendant only abused her when she had misbehaved. She wrote the note hoping that her stepmother would stop the abuse.

The victim described her first sexual encounter with the Defendant, which was not the basis for any charges, which occurred when she was in bed at night. The Defendant

4

came in her room and asked, "Do you want to be a big girl," to which the victim replied, "yes." The Defendant, who had laid down next to her on his back, stood her up with her legs on either side of him, took her pants off, told her to turn around and sit down, and again asked her if she wanted to be a big girl. The victim testified that she "just stood there," then said "no." The Defendant told her to put her pants back on and not to tell anybody about what had happened before leaving the room.

The victim testified about the facts the State elected to support the charge in Count 1. She said that, shortly after the first incident, but on another night, the Defendant woke her and carried her into his room. The Defendant had her take her pants off, positioned her on hands and knees facing the wall, removed his own pants and "put his private parts in [her] butt." The victim said that this hurt, and she was crying, but the Defendant told her to be quiet as "his private part kept on going in and out of my butt." When the Defendant eventually stopped, he took her to the shower adjoining the dining room and showered with her and the victim said that both she and the Defendant washed their respective genitalia. The Defendant reminded her not to tell anyone, after which she went back to bed.

The victim testified about another incident, which the State elected to support the charges in Counts 2 and 3. During this incident, the Defendant once again got her up during the night, walked her to his room, and "put his private part in [her] butt again." She told the Defendant she did not like it, and "he said if you don't like that, then put your mouth on my private." The victim complied and said, "I had to go up and down with my mouth," because the Defendant told her to "suck it like a lollipop." The victim said that, after a time, the Defendant let her stop, and the two took a shower and went to bed.

The victim testified to a fourth incident, which the State elected to support the charges in Counts 4 and 5. During this incident, the Defendant "started licking her private parts." It again started when the Defendant had gotten her up during the night. He walked her to his bedroom, put her on the bed and asked her what she wanted to watch on TV. The Defendant once again "put his private in my butt" and had the victim "put [her] mouth on his private." The Defendant then knelt on the floor beside the bed and "started licking my private parts." Once the Defendant eventually stopped, they took a shower together, and she went to bed.

The victim testified about another incident that the State elected to support the charges in Count 6. During this encounter the Defendant was "laying down on his back, and my legs were on both sides of him. And I had to sit down on his private" while facing away from the Defendant. The victim testified that there were multiple instances in which the Defendant had made her "put [my] mouth on his private and put his private in [my] butt," but did not recall specifically how many times this had occurred.

5

The victim described that "sometimes," when she performed fellatio upon the Defendant, he penetrated her with his finger, saying "When I was putting my mouth on his private, he would put his finger in my butt." The State elected these facts to support the charges in Count 7 and 8.

The victim said that, before the Defendant anally penetrated her, he would first put cream on himself. She described the container as being blue and white and labeled "Kroger," which he kept on the dresser. The victim clarified, in her own terms, that the Defendant penetrated her anus when he abused her and not merely the cheeks of her buttocks. The victim testified that the nighttime encounters occurred while Ms. Walker was at work. The Defendant would put a blanket over her baby stepbrother's crib and close the door to the room in which her brothers slept. The Defendant would tell her to "shut up" if she cried because of the pain. The victim said that, at the time, she was afraid if she told anyone that "he would do it again." The Defendant made her sometimes say "give it to me" and other things as he was anally penetrating her.

The victim testified about two encounters with the Defendant that occurred outside his bedroom, one on the dining room table and the other on the couch. In the first encounter, which the State elected to support the charge in Count 9, the victim said, "Everybody was with my stepmom at the store and I was in my room. And my dad told me to take a shower, so I took a shower. And he told me to put a dress on, so I did. And then he put me on the [dining room] table. And then he started putting his private part in my butt." In the second encounter, which the State elected to support the charge in Count 10, the Defendant anally penetrated the victim while she was on her hands and knees on the couch in the living room.

Early in the series of sexual abuse incidents, the Defendant had twice shown the victim videos on a cell phone that depicted "a girl and a boy doing the same thing he was doing to [her]." On one of these occasions, the victim testified she was on her hands and knees facing the wall against which the phone was leaning, while the Defendant was "putting his private part in my butt." In the video, there was a girl and a boy doing the same thing. The State elected these facts to support the charges in Count 11.

The victim recalled the Defendant showing her another video in which "a woman was putting her mouth on a boy's private" while at the same time, the Defendant had the victim "putting my mouth on his private." The participants in the video appeared to be a teenage girl and a grown man. The girl was African American, wearing glasses and a black dress with silver sparkles. The State elected these facts to support the charge Count 12. The victim said she had never before seen a video depicting sexual activity.

The victim testified that her letter to Ms. Walker was the first time she had ever told anyone of the abuse and that she believed the abuse began at the start of her third-grade school year. The abuse ended when her Nana, Ms. Walker's mother, came to live with them. Nana was in the house at night while Ms. Walker was at work. She wrote the letter about two weeks after Nana came to live with them, and it had been about a year since the last instance of abuse at the time she wrote the letter.

The victim said that, before any of the sexual abuse incidents occurred, she once got in trouble for urinating in a closet, explaining that she was afraid to use the bathroom because there were always "spiders and cracks and mold in there." When the Defendant confronted her about this, he asked, "Did anybody touch you," and she lied and told him that her stepbrother who lived in Kentucky with her biological mother had abused her. When asked why she had blamed her stepbrother, the victim testified that she was afraid the Defendant would hit her, as he had before. When the Defendant confronted her further about what she had said, the victim testified that she took it back.

The victim also testified that she had once gotten in trouble for stealing Rice Krispie treats at her school. When her principal approached her about this, the victim told the truth. She said that the Defendant was so upset upon hearing that she had taken the treats, he sexually abused her. The school removed the victim from the cheerleading squad for stealing the Rice Krispie treats. At the time that she wrote her letter to Ms. Walker, she was "still in trouble" with Ms. Walker and her father, but she said that she had not written the letter just to get the Defendant in trouble with her stepmother.

The victim said that, when Ms. Walker did not find the letter on the dining room table, she put it in her backpack and took it to school. At school she put it in her notebook. The following day, her teacher asked her to put her things away and go to the office where the principal told her that the bus driver found her letter on the school bus. The victim met several ladies who talked with her about the letter. After talking with the ladies, she had been taken to sit with a vice-principal until later in the day, when she was taken to another location for an interview. She was told the interview would be recorded. She said she was both complete and truthful in her statements to the interviewer. She agreed that the State had asked her to refresh her memory by reviewing her interview before testifying at trial, since the interview had by then taken place about a year earlier.

On cross-examination, the victim testified that the first person she could remember telling about the abuse was her principal or vice-principal. The victim only kept the letter overnight after Ms. Walker had failed to see it on the dining room table. She did not remember ever saying that she had written the letter a few weeks before it was found. The victim did not know whether the letter had originally been found on the school bus.

7

The victim maintained that she only recalled two incidents where the Defendant "lick[ed] her privates." The defense asked the victim why she had not mentioned the instances of abuse that occurred on the dining room table and the Defendant putting his fingers in her anus in the forensic interview, and the victim said that she did not remember omitting it in the interview. The defense asked the victim why she had not mentioned the Defendant making her say things during the forensic interview, and she said that she could not recall being asked that in the forensic interview. She maintained that the Defendant "did make me say things."

The victim said that she visited her mother in Kentucky when she was out of school but that she did not talk with her mother about the sexual abuse before writing her letter. The victim said that she lied to the Defendant about her stepbrother touching her because "if I told him I didn't want to use the bathroom because there were spiders and mold and stuff in there, then he would have hit me." She did not remember any further specifics on what she related to the Defendant about her stepbrother touching her.

The victim testified that she did not want to live with Defendant, saying that nobody ever talked to her there, she was always getting in trouble, and they never did anything fun. She said she did not particularly get along with her brother and stepbrother because "they never played with me or anything," and "were always in their room." The victim testified that her mother in Kentucky "played games with us, sometimes she would take us places. And everybody was nice to me." The victim said that, by writing her letter, "I really didn't think I was going to live with my mom. But when they told me she was coming to get me, then I thought I was going to live with her."

Lydia Lorena Rosales-Ortiz testified through an interpreter that she was a mother with children who attended the Bradley Academy and her children rode the bus to school. Ms. Rosales-Ortiz testified that her daughter Tzury was helping her learn English and would gather papers or notes for her to read. Tzury found a note on the bus underneath the seat, which she brought to her. When Ms. Rosales-Ortiz read the note, she was shocked. She turned the note into the director of the school, "because I think it is the right thing to do and because I am a mother." Ms. Rosales-Ortiz turned the note into the principal within two days of finding it and did not know who had written the note.

Jenny Ortiz, who was of no relation to Ms. Rosales-Ortiz, testified that she was the principal at the Bradley Academy at the time of these events. Principal Ortiz testified that she worked closely with Bradley Academy school counselor, Amanda Adams, in addressing any issue that came up with students or parents. She described the victim as a "typical student . . . not a child who I spent time with as far as discipline."

8

Principal Ortiz described an event after school during the victim's fourth grade year. She recalled that a couple of girls on the cheer leading squad took a box of Rice Krispie treats that a teacher had brought into the school. Principal Ortiz recalled the victim was honest and admitted she had participated in taking the treats without permission, explaining that she was hungry and wanted an extra treat. Principal Ortiz told the victim that, as a consequence, she would be withheld from participating as a cheerleader that evening and that Principal Ortiz would be calling her parents. The victim seemed very upset when she heard that the principal would call the Defendant and said that she did not want to get into trouble. When Principal Ortiz called the Defendant to tell him what happened and that the victim was suspended from the cheerleading squad for that evening, the Defendant was upset, and said "No, I'm done, and she is off the team." Principal Ortiz testified that the Defendant subsequently pulled the victim off the cheerleading squad.

Principal Ortiz testified that the Rice Krispie treat incident had occurred about the beginning of November 2017. A few weeks later, a parent gave Principal Ortiz a note that her daughter had found on the bus. After reading the note and recognizing the names mentioned therein, Principal Ortiz suspected the victim was the author. She asked the school counselor to read and evaluate the note, and then they called the victim in to speak with them. Principal Ortiz put the note on the table and asked the victim if she knew what it was and whether she had written it. The victim immediately said yes and started crying, and their questioning stopped so they could contact DCS and the police. Principal Ortiz explained that it was necessary that she determine who authored the note before calling DCS but that, thereafter, the questioning ceased until DCS arrived. After police and a DCS representative arrived, they interviewed the victim outside the presence of Principal Ortiz and Ms. Adams.

Chelsa Wade testified that she had been employed as a Child Protective Services Investigator with DCS for about three and one-half years. Ms. Wade testified that the referral in the victim's case came in through the department hotline and was assigned to her. Because it involved potential sexual abuse, she classified it as "priority one," and contacted law enforcement to let them know she was the investigator and to arrange to meet law enforcement at the school. At the school, she met Detective Knox and together they interviewed the victim.

Ms. Wade recalled the interview, saying that, at first, they asked the victim about the contents of her note, and the victim seemed "shocked" that Ms. Wade and Detective Knox knew about it. The victim became emotional, crying and appearing distressed. Ms. Wade said she created a summary of the interview from her memory about three weeks after the actual conversation, so she did not recall specifically what the victim said about when she had written the note. The victim may have said she wrote it a few weeks before it was found. Ms. Wade attempted during the interview to get the minimum facts necessary

9

to proceed, as was her procedure, because a forensic interviewer would conduct a more detailed interview later that day.

After the initial interview, Ms. Wade and Detective Knox visited the victim's home where they spoke with Ms. Walker and informed her of the allegations and investigation. Based on that discussion, the two determined that the victim might not be safe with Ms. Walker, so they contacted her biological mother in Kentucky, who agreed to come and retrieve the victim the same day.

Sometime later on the same day, Ms. Wade was present for the victim's forensic interview, which was conducted at the Child Advocacy Center in Murfreesboro. Ms. Wade testified that the victim made additional, more detailed disclosures during her forensic interview, but the disclosures were generally consistent with both the initial interview and those in the note.

The same day, the victim's biological mother, Ms. Allen, came to Tennessee get the victim and the victim's biological brother. Ms. Wade also had the victim's brother participate in a forensic interview, during which he said he had never witnessed or been the victim of sexual abuse. The victim's brother said he preferred to live with Ms. Allen. Ms. Wade contacted DCS in Kentucky about the case, and asked Ms. Allen to follow up. To her knowledge, Ms. Allen had enrolled both children in school and had the victim participate in counseling.

Ms. Wade said that, as a routine part of her investigation, she looked for any other referrals made by the victim. While she found none, she did learn of an allegation that the victim made against her stepbrother that she had quickly recanted.

On cross-examination, Ms. Wade testified that in this case the forensic interview was the primary investigative tool intended to determine the veracity of the allegations. Ms. Wade's role was to schedule the interview while someone else conducted it. Ms. Wade testified that she created a summary of her November 16, 2017, interview with the victim on December 7, 2017. Her notes were not entirely clear about when the victim said that she had written the note in relation to when it was found.

Ms. Wade explained that she was concerned for the victim's safety in the home of the Defendant and her stepmother because, when informed of the allegations, Ms. Walker immediately responded that the victim was lying and that Ms. Walker "would beat her ass" when she got home. While Ms. Walker's reaction might be consistent with that of someone who is upset about a false allegation, she did not believe physical discipline was appropriate because she credited the victim's forensic interview. Ms. Wade testified that she did not interview the victim's stepbrother.

10

On re-direct examination, Ms. Wade testified that the victim's brother's statement in his interview that he had not seen any abuse was consistent with the victim's claim that no one had seen the abuse.

Detective Tannas Knox testified that she had been employed as a police officer by the Murfreesboro Police Department for twenty years and was a detective with the Special Victims Unit since 2007. Detective Knox testified that the Special Victims Unit dealt with cases involving rape, domestic abuse, sexual abuse, and physical or sexual abuse of children. Detective Knox testified that referrals on potential child abuse cases sometimes came directly to the department or through DCS who worked with the police on those cases.

Detective Knox testified that, on November 16, 2017, she responded to the Bradley Academy about this case and met Ms. Wade there. On arrival, Detective Knox and Ms. Wade spoke with Principal Ortiz about a letter that was found on a school bus and later turned in by a parent. Detective Knox took custody of the letter, and she and Ms. Wade briefly met with the victim to determine if she had authored the letter and whether a Child Advocacy Center forensic interview was warranted. Detective Knox testified that this cursory interview procedure required investigators to not ask any leading or suggestive questions and only obtain information essential to determine if a forensic interview is needed.

Detective Knox testified that, based on what she heard in the cursory interview and the victim's demeanor, she called the Child Advocacy Center and set up a forensic interview for later that day. Detective Knox described the cursory interview saying that, when she showed the victim the letter and asked her about its contents, the victim became upset and started twisting her hair. The victim confirmed that she had written the letter and that the things described in it were true. The victim said she had written the letter for her stepmother, Ms. Walker, and put it on a table, but that Ms. Walker had not picked it up, so the victim kept it in her book bag at school. Detective Knox did not tell the victim how the letter had been recovered and did not ask her to further describe the events in the letter.

Detective Knox drove the victim to the forensic interview, which was not normal procedure. Normally, she would have contacted a parent to drive the child, but she and Ms. Wade were concerned after speaking with Ms. Walker, who she said was going to "beat [the victim's] ass." Detective Knox and Ms. Wade determined that one of them should take the victim to the forensic interview.

Detective Knox observed the forensic interview, along with Ms. Wade, and said that it was much more detailed than the minimal information interview she and Ms. Wade had

11

conducted earlier at the school. The information that the victim provided was consistent with the earlier interview. Detective Knox testified that the victim talked about events that had started the summer before and ended at the time her Nana had come to live with them, about two weeks before Detective Knox had contact with the victim. Detective Knox explained that a victim's delayed disclosure was "very common" in cases of child sexual abuse and that delay can affect the types of physical evidence that can be collected because evidence like that collected by a sexual assault kit examination is not typically available after three to five days. Because it had been about two weeks since the last reported instance of sexual abuse, she would not expect physical evidence to still be present.

Detective Knox recounted that because the victim mentioned during the forensic interview that the Defendant had shown her pornographic videos, she wanted to collect any electronic devices that could store pornographic material.

Detective Knox noted that Ms. Walker's time records confirmed that she worked nights during the time of the alleged abuse, so the Defendant had the opportunity to be alone with the victim. Detective Knox testified that she did not reinterview the victim, as it was standard procedure not to do so in these types of cases.

Detective Knox testified that she had asked the Defendant for his phone when they met at the police department, but the Defendant told her that he did not have it with him. When she followed up with the Defendant the next day, she collected a phone. Detective Knox subsequently met with the Child Protective Investigation Team, and they recommended that the victim's home be searched for any other electronic evidence. Detective Knox prepared a warrant for the search she later conducted in December, about a month after she initially interviewed the victim. During the search she looked for any electronic devices, thumb drives, external hard drives, computers, and phones that could store the media the victim said the Defendant had shown her, namely videos of a father/daughter engaging in various sexual acts and a black female wearing a black dress with sparkles and engaged in father/daughter sexual activity. She also looked for a Kroger brand of cream to corroborate the victim's allegations that the Defendant used that when he anally penetrated her. Detective Knox testified that the search resulted in the collection of several thumb drives, a computer hard drive, an external hard drive, two other damaged cell phones, and a bottle of personal lubricant.

Detective Knox submitted the cell phones and other electronic devices to a forensic team specialized in recovering images from hard and thumb drives with details about the kind of evidence she was looking for, including any instances of child pornography. While she could not identify any instances of child pornography, other pornography was found on the external hard drive that was generally consistent with, but not an exact match to, the victim's description. Detective Knox testified they found "lots" of videos with oral and

anal sex and black females, four which were titled daddy/daughter and depicted a "daddy" and daughter having sexual relations. Some of those videos included a woman wearing a black dress, but not a black "sparkled" dress. Detective Knox testified she did see other sparkles in the videos, including sparkle earrings, sparkle necklaces, and sparkle belts. Detective Knox testified that they did not ask the victim to view the pornography they found to specifically identify if it was what the Defendant had shown to her.

On cross-examination, Detective Knox testified that, in her initial interview with the victim, the victim alleged that the Defendant had committed both oral and anal sex upon her. The Child Protective Investigation Team convened for this case on December 6, 2017, after the initial school minimal facts interview, the victim's forensic interview, and the collection of the Defendant's cell phone. Detective Knox testified that the forensic analysis of the Defendant's cell phone was not completed by the time of this meeting. The meeting was aimed at determining whether the victim's case rose to the level of criminal prosecution.

Detective Knox testified that she and the victim did not discuss the allegations during the ride to the victim's forensic interview. Although the victim's allegations included penetration, the detective did not gather any clothing items. She explained that it had been more than two weeks since the last alleged encounter and that the victim had not mentioned blood or bodily fluids. This made the detective think it unlikely that an examination of clothing would reveal anything of evidentiary value.

Detective Knox agreed that the Defendant came willingly to the police department to meet with her, and that, when asked for his phone, the Defendant said he had left it at home. Detective Knox testified that no pornography was found on the cell phone. While pornography was found on the external hard drive, it was impossible for the investigators to determine if that pornography had been downloaded to the phone. Detective Knox testified that the Defendant had consented to a search of his phone.

Detective Knox testified that, in her police department interview with him, the Defendant alleged that the victim wanted to live with her mother in Kentucky and had lied about this kind of thing before. Since Ms. Walker had also alleged that the victim was lying, the detective followed up with DCS to determine if any prior referral had ever been filed in the past. DCS confirmed there were no prior complaints.

Jill Howlett testified that she had been employed as a Social Worker at the Our Kids Center, an outpatient pediatric clinic of General Hospital in Nashville, since August 2011. Most referrals to Our Kids Center came from the Department of Children's Services, and the center sees about 850 kids per year ranging in age from birth to 17 years old. The clinic uses a standard procedure for each child that comes in, where first a social worker sits down

with the parent, adult, or caregiver bringing the child in and get history about the family, child, and what brought them to the clinic. If the child was five or older, the social worker would then take the child into the exam room by themselves and get a medical history, which was shared with the nurse practitioner conducting the medical exam.

Ms. Howlett recalled that the victim's mother brought her to the clinic on November 30, 2017, at which time Ms. Howlett took the victim's medical history. This medical history consisted of everything the child knew about his or her body and an assessment of the child's development and ability to communicate. Ms. Howlett explained to the victim the types of questions she would be asking her and ensured the victim understood why she was asking the questions and the importance of her answers. She then asked the victim about any previous injuries, surgeries, stitches, broken bones, medications, names she used for her genitalia, and whether anyone had ever touched her genitalia.

Ms. Howlett asked the victim for her names for places on her body that no one should touch, and that the victim called them her "private parts" and her "butt." When Ms. Howlett asked the victim if anyone had ever touched her on her private parts or her bottom, she said that her father, the Defendant, had touched her private and her butt. The victim stated, "He licked his tongue in my private," on more than one occasion. The victim said that the Defendant had not done anything else to her private, but that "he put his private part up my butt" more than once. The victim told her the Defendant "put his fingers [in her butt] a bunch of times," and that "he made me put my mouth on his private part" and that "happened a lot of times, too." The victim told Ms. Howlett that she had never seen anything come out of the Defendant's private part and that he had not touched her in any other way. The victim said she was eight years old when the first instance of abuse occurred, and the last incident occurred just before her Nana had come to live with them. She said that no one else had ever touched her in an inappropriate way.

Ms. Howlett testified that forensic interviews were not recorded, but the center did make a written record of those conversations by dictating a report, typically completed within twenty-four hours. Ms. Howlett provided the victim's medical history to Nurse Practitioner Hollye Gallion for the medical examination.

On cross-examination, Ms. Howlett testified she could not speak to the veracity of the victim's statements but only relay what the victim alleged.

Nurse Practitioner Hollye Gallion testified as an expert in pediatric forensic examinations. She said had been employed at the Our Kids Center for nineteen years and had performed or supervised approximately 5,000 examinations. Her role was to do the physical exam, order labs and any testing required to make sure the child's body is healthy, and if there is any injury or a physical issue to make that diagnosis.

14

Ms. Gallion examined the victim using the information provided to her by Ms. Howlett, which included alleged instances of cunnilingus performed on her by the Defendant and fellatio performed by the victim upon the Defendant and anal sex. She did not expect to find signs of injury given the type of abuse and the duration of time that elapsed between the abuse and the examination. While not expecting to find injury, Ms. Gallion said that the examination was still necessary to rule out infection and to reassure the victim that her body was okay.

The forensic interviewer in this case, Amanda Pruitt, testified that she interviewed the victim on November 16, 2017, and recorded the interview. The video was played for the jury and largely comported with the victim's trial testimony. Ms. Pruitt testified there were two breaks in the interview when she went to an adjoining observation room where the DCS investigator and law enforcement officer were observing to ask if they had additional questions or needed clarification of anything the victim had said. In her experience, when abuse has occurred over an extended period, it is not possible to get every detail of every incident that occurred, and generally the center only allows the interview to last an hour.

On cross-examination, Ms. Pruitt testified that part of a forensic interview is to gather more information, so questions in such an interview are intentionally open-ended in that the child's answer may result in a request for the child to say more about that answer. While each referral is different, most of her interviews cover the same questions. After asking most of her questions, Ms. Pruitt took a break to confer with the DCS and law enforcement representatives observing, because they might have different questions or want clarification on certain things.

Ms. Pruitt testified that the center tries not to do multiple interviews with a child as a best practice because discussing trauma can be hard on a child. She also said that, if there were a new disclosure of any type of abuse and they requested an interview, she would do it. That did not happen in this case. Ms. Pruitt recounted that her interviewees are always told they can take a break.

On re-direct examination, Ms. Pruitt testified that it is generally impossible for a child to talk about every detail of every event in which they were abused over an extended period in a one-hour interview. The forensic interview therefore provides the basis for investigation.

Based on this evidence, a Rutherford County jury convicted the Defendant of ten counts of rape of a child, a Class A felony, and two counts of solicitation of sexual exploitation of a child by electronic means, a Class E felony. The trial court sentenced the

15

Defendant to a sentence of thirty years in the Tennessee Department of Correction for each of the ten Class A felonies and two years for each of the Class E felonies. It ordered all sentences to run concurrently.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it admitted pornographic material found on his electronic devices and that the evidence is insufficient to support his convictions.

### A. Pornographic Material

The Defendant contends that the trial court erred when it admitted adult pornographic material found on electronic devices that law enforcement confiscated pursuant to a search of his home. He asserts that the videos were not relevant because none of the pornography found on his electronic devices exactly matched the victim's description, which included that the woman depicted in the video was wearing a "black dress with silver sparkles." He further asserts that, even if relevant, the probative value of this evidence was outweighed by its prejudicial effect on the jury, citing Tennessee Rule of Evidence 404(b). He explains that, while pornography is not a "crime," it is considered a moral wrong. Its admission, therefore, constituted admission of a "bad act" and it prejudiced the jury against him.

The State counters that the evidence was used to support his conviction for sexual exploitation of a minor by electronic means. The State further asserts that the videos admitted substantially comported with the victim's description and depicted two people engaged in sexual acts in the role of "daddy/daughter." As such, the State asserts, the trial court did not err when it admitted the evidence.

During the forensic interview, the victim said that the Defendant showed her pornographic material on a phone. She said that he showed her the same video on two separate occasions and that the video depicted what she assumed was an African American female "teenager" wearing a black dress "with silver sparkles" engaged in sexual acts with someone who looked like the teenager's father. The victim said that the female was putting her mouth on the man's private parts. The man then put his private parts in the female's private parts and then in her "butt." The victim said that the Defendant forced her to watch this while he put his penis in her mouth.

Based upon this information, law enforcement obtained a search warrant for electronic devices in the Defendant's home. Forensic analysis of the devices confiscated showed multiple pornographic videos found on the Defendant's external hard drive. Some

of those videos were labeled "daddy/daughter" and some depicted an African American female in a black dress engaged in the same sexual acts as described by the victim. Detective Knox testified about the pornography shown, but the State never played the videos for the jury or introduced any evidence beyond the victim's and the detective's testimony about the videos. The detective testified that the female's black dress in the video found did not have "silver sparkles."

In its order denying the Defendant's motion to exclude the pornographic evidence found on his electronic device, the trial court found:

> [A]s to the earlier motion concerning the motion in limine to exclude any evidence that the Defendant viewed or possessed pornography, the Court heard testimony from Detective Knox, has had the opportunity to review the motion, the State's response to the motion.

> And it would appear to the Court, based on the testimony today, that there was pornography that matched or was consistent with the description of the child during the forensic interview. And would also note that the argument by Defense that that was not entirely consistent or did not match the description given by the child word for word during the interview.

> However, the Court believes that that is--that that goes to the weight that the jury might put on the evidence, not on whether or not the evidence itself is more prejudicial than probative or whether or not it should be excluded under 404(b).

> The Court finds and appreciates the Defense raising the issue prior to trial so that we didn't have to take an hour out at some point during the trial while the jury was outside the courtroom to take up the issue.

> And, so, the Court finds that it is proper to be before the Court today. That the Court has held a hearing certainly outside of the jury's presence. We don't have a jury at this point. And the Court finds that there is a material issue other than conduct conforming to a character trait as to the evidence as to whether or not pornography that consisted of events that included interactions and sexual relations, including fellatio and anal sex, between a father and a daughter, consistent with that described by the alleged victim in this case.

> And find that it falls within the material issue exception in that it shows opportunity. Certainly[,] a child cannot be shown pornography if

17

there was not pornography available to be shown.  Also shows intent in that the child indicated that it could be inferred that the showing of the video to the child was an indication of what was to take place during the abuse.

And for those reasons, the Court finds that the probative value is not outweighed by the danger of unfair prejudice, and that testimony as set forth by the State would be admissible.  And by that, I mean the State indicates that their questioning would be as to whether or not there was pornography found in the Defendant's possession that was consistent with that alleged by the child to be seen.

The Court appreciates the opportunity to review these issues.  Find that there is case law on both sides.  However, the Court finds that based on the specific events alleged in this matter, the specific charges indicted, and the testimony provided during today's hearing would indicate that it would be admissible under the grounds set out by the Court in making its decision.

The Defendant first contends that the detective's testimony about the pornography found on his external hard drive was not relevant.  The admissibility of any piece of evidence depends on its relevance.  Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee.  Evidence which is not relevant is not admissible."  Tennessee Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record."  *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).  A trial court is found to have abused its discretion when it applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'"  *Lewis*, 235 S.W.3d at 141 (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).  "[T]he modern trend is to vest more discretion in the trial judge's rulings on admissibility."  *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000).  This standard governs our review of the trial court's determination of whether the testimony about the pornography was relevant.

We conclude that the trial court did not abuse its discretion when it determined that the detective's testimony about the pornographic material was relevant.  The victim

testified at trial that, early in the sexual abuse incidents, the Defendant had twice shown her videos on a cell phone that depicted a "girl and a boy" engaged in the same sex acts as she and the Defendant. On one of these occasions, the Defendant was anally penetrating her while she watched the video. On another occasion, the girl in the video was putting her mouth on the man's private part. While she watched the video, the Defendant put her mouth on his penis. The victim said that the participants in the video appeared to be a teenage, African American girl, who was wearing a black dress with silver sparkles, and a grown man. This testimony was the basis for the State's sexual exploitation of a minor by electronic means charges, Counts 11 and 12. When the detective testified, she confirmed that pornographic material had been found on the Defendant's external hard drive. It was entitled "daddy/daughter" and it depicted an African American female wearing a black dress performing the acts described by the victim. There were no "silver sparkles" on the dress.

This evidence was clearly relevant pursuant to Tennessee Rule of Evidence 401, which defines relevant evidence as any evidence having a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." While the detective noted that the pornography was not an exact match, the fact that she found pornography that substantially comported with the victim's testimony had a tendency to make her version of events more probable. As such, we conclude that the evidence was relevant.

Even relevant evidence, however, may be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Tennessee Rule of Evidence 404 balances the admissibility of relevant evidence with the concerns that "a person's character or trait of character" or "[o]ther crimes, wrongs, or acts" may have the potential to influence the jury's assessment of the person's character. In the case under submission, the Defendant contends that the trial court's admission of evidence that he possessed legal adult pornography violated 404(b) and prejudiced the jury against him.

As previously stated, we generally review evidentiary rulings under an "abuse of discretion" standard. However, when we consider evidence that implicates Tennessee Rule of Evidence 404(b), we review the trial court's admissibility ruling de novo unless the trial court substantially complied with the procedures outlined in Rule 404(b). If the trial court substantially complied with Tennessee Rule of Evidence 404(b), we will overturn the ruling only if the trial court abused its discretion. *State v. Kiser*, 284 S.W.3d 227, 288-89 (Tenn. 2009); *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that

causes an injustice to the complaining party. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008).

Substantial compliance with Tennessee Rule of Evidence 404(b), requires:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

In the case under submission, the trial court substantially complied with 404(b). It held a hearing outside the jury's presence, and it determined that a material issue existed, namely the charged offenses, the Defendant's opportunity to show pornography, and the victim's credibility. The trial court found the proof of the possession of the pornography was clear and convincing and that the probative value outweighed any prejudice. Under these circumstances and considering the clarity of the trial court's findings, we review the trial court's findings pursuant to an abuse of discretion standard. We therefore turn to decide whether the trial court abused its discretion when it determined that the detective's testimony was admissible.

According to the Advisory Commission Comment, "evidence of other crimes should usually be excluded." In "the exceptional case," however, another crime, wrong or act could be "arguably relevant to an issue other than the accused's character." Such relevant issues include "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake." Tenn. R. Evid. 404, *Advisory Comm'n Cmt*.

Evidence offered for the purpose of showing "conformity with [a particular] character trait" is often called propensity evidence. Courts must closely scrutinize propensity evidence not because such evidence is irrelevant, but because juries tend to ascribe it undue relevance. Propensity evidence may lead a jury to convict, not because they are certain the defendant is guilty of the charged crime, but because they have determined the defendant is "a bad person who deserves punishment" whether or not the crime was proven beyond a reasonable doubt. *State v. Rodriguez*, 254 S.W.3d 361, 375 (Tenn. 2008). The danger of a jury misusing propensity evidence is particularly strong when "the conduct or acts are similar to the crimes on trial." *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994).

The pornography about which the detective testified was legal, so generally, the admissibility of evidence concerning a defendant's pornography use is governed by Tennessee Rule of Evidence 404(b). *See Rodriguez*, 254 S.W.3d at 374; *State v. McCary*, 119 S.W.3d 226, 246 (Tenn. Crim. App. 2003), *perm. app. denied* (Tenn. July 7, 2003). While using adult pornography is not a "crime," in most circumstances, many people consider it a moral "wrong." *State v. Clark*, 452 S.W.3d 268, 289 (Tenn. 2014). Although we have previously explained that only prior "bad acts" implicate Tennessee's Rule 404(b), *see State v. Reid*, 213 S.W.3d 792, 813-14 (Tenn. 2006) (finding that handgun possession is not a bad act that warrants Rule 404(b) analysis), pornography use has such prejudicial potential that it should be addressed through Rule 404(b). Caution is especially warranted in trials for sex crimes because a jury may infer from a defendant's use of pornography that the defendant had the propensity to engage in other morally questionable sexual behaviors. *Clark*, 452 S.W.3d at 289.

We first conclude that the evidence offered by the detective regarding the pornography was directly related to the charges faced by the Defendant, namely sexual exploitation of a minor. Tennessee Code Annotated section 39-13-529 (2019) states:

> (b) It is unlawful for any person eighteen (18) years of age or older, directly or by means of electronic communication, electronic mail or internet service, including webcam communications, to intentionally:
>
> . . . .
>
> (2) Display to a minor, or expose a minor to, any material containing . . . sexual activity if the purpose of the display can reasonably be construed as being for the sexual arousal or gratification of the minor or the person displaying the material; . . . .

Here, the victim testified that the Defendant showed her pornography depicting sexual activity on two occasions. She described the video that he showed her, the actors, who she said appeared to be a father and daughter, and the sexual activity in which they were engaged. The testimony from the detective confirmed that a review of the Defendant's hard drive showed that there was pornography material entitled "daddy/daughter." That material included actors of the same race the victim described, of the same relative ages she described, engaged in the same activity she described and wearing substantially the same clothing she described. The only discrepancy included that the dress worn by the female actor did not have sparkles.

We conclude that the detective's testimony was not that of "other wrongs;" rather it was testimony directly related to the actual charges leveled against the Defendant. Any

discrepancy between the victim's account of the pornography shown to her and the detective's findings goes to the weight of the evidence against the Defendant. The jury, by its verdict, believed that the Defendant possessed and showed to the victim pornographic material on an electronic device. We conclude the trial court did not err in its admission of the detective's testimony about the videos that substantially comported with the victim's testimony and supported the two solicitation of a minor charges.

We further conclude, however, that the trial court should have limited the detective's testimony to finding of a video that substantially supported the victim's recollection. The trial court erred to the extent that it allowed Detective Knox to testify that law enforcement found "lots" of videos with oral and anal sex and black females, only four which were titled daddy/daughter and depicted a "daddy" and daughter having sexual relations. When a trial court errs by admitting evidence that is forbidden under the Tennessee Rules of Evidence, we address this non-constitutional error using the harmless error analysis of Tennessee Rule of Appellate Procedure 36(b). Pursuant to Tennessee Rule of Appellate Procedure 36(b), the defendant bears the burden of showing that the erroneous evidence "more probably than not" affected the verdict. To conduct a review under Tennessee Rule of Appellate Procedure 36(b), we review the entire record in order to ascertain the actual evidentiary basis for the jury's verdict. The crucial consideration is what impact the error may reasonably have had on the jury's decision-making process. When the error more probably than not had a substantial and injurious impact on the jury's decision-making process, it is not harmless. In general, the more evidence there is to support the defendant's guilt, the more likely it will be that the error was harmless. *Rodriguez*, 254 S.W.3d at 371-72.

We find that the trial court's admission of the detective's testimony that there were "lots" of videos that depicted oral and anal sex was harmless error. The detective properly testified about multiple videos showing what appeared to be a daughter engaged in sexual activity with a father. Her testimony that there were "lots" of other videos did not "more probably than not" affect the verdict. As such, we conclude that the Defendant is not entitled to relief on this issue.

**B. Sufficiency of Evidence**

The Defendant next contends that the evidence is insufficient to sustain his convictions for rape of a child and sexual exploitation of a minor. He asserts that he was convicted for rape of a child based on the victim's testimony alone and that her testimony was inconsistent over time. He points out that she changed her testimony about whether she was in trouble at the time she wrote the letter about the abuse and that she made a false allegation about her stepbrother. The Defendant's argument relies entirely on what he posits is the victim's lack of credibility. He further asserts that regarding the sexual

exploitation of a minor convictions, the victim's testimony about the pornography differed from the pornography found in his possession, so his conviction cannot stand.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

"Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (2019). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7).

In the case under submission, the Defendant contends that the evidence is insufficient to sustain his convictions because the only evidence against him was the victim's testimony and she was not credible. After considering the evidence, the jury returned guilty verdicts on the child rape charges, and the verdicts were approved by the trial court. Clearly, the jury chose to believe the victim. Such verdicts "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Bland*, 958 S.W.2d at 659 (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn.1973)). Furthermore, a jury's verdict will not be overturned unless there are inaccuracies or inconsistencies that "are so improbable or unsatisfactory as to create a reasonable doubt of the [defendant's] guilt." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999). The Tennessee Supreme Court has upheld a child rape case based upon the victim's testimony alone, even if the face of contradictory testimony. *State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003).

Considering the jury's verdict and our standard of review, we conclude that the jury found the victim's recount of the rapes credible. We will not overturn that finding. The State elected facts to support each of the ten rapes, and the jury properly convicted the Defendant for ten counts of rape of a child based upon the victim's testimony.

The Defendant also contests his convictions for sexual exploitation of a minor using electronic means. He asserts that the pornographic videos did not match the description by the victim. Sexual exploitation of a minor by electronic means occurs when any person eighteen years of age or older, directly or by means of electronic communication, electronic

24

mail or internet service, including webcam communications, intentionally displays to a minor any material containing sexual activity if the purpose of the display can reasonably be construed as being for the sexual arousal or gratification of the minor or the person displaying the material. T.C.A. § 39-13-529.

Again, any discrepancy in the victim's testimony went to the weight of the evidence against the Defendant. The jury heard the victim's testimony about the pornography. It then heard the detective's testimony about the pornography found in the Defendant's possession. It concluded that the pornography found was the pornography the victim described, meeting the elements of the relevant statute defining the offense. We conclude that the jury did not err in its findings. As such, the Defendant is not entitled to relief on this issue.

## III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE